IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SPECTRUM UA CREDIT LLC and GENO PIKULIK, individually and as a member of Spectrum UA Credit LLC,<br><br>      Plaintiffs,<br><br>  v.<br><br>UKRAINE, THE NATIONAL BANK OF UKRAINE, THE DEPOSIT GUARANTEE FUND, AND THE SECURITY SERVICE OF UKRAINE,<br><br>      Defendants. | Case No. |

## COMPLAINT

Plaintiffs, Spectrum UA Credit LLC and Geno Pikulik, bring this suit against Ukraine, the National Bank of Ukraine, the Deposit Guarantee Fund, and the Security Service of Ukraine, and alleges as follows:

### THE PARTIES

1.     Plaintiff, Spectrum UA Credit LLC ("Spectrum U.S."), is a limited liability company established in the state of Delaware. Spectrum U.S.'s registered address is at 251 Little Falls Drive, Wilmington, Delaware, 19808. Spectrum U.S.'s principal place of business is located in Newport Beach, California.

2.     Plaintiff, Geno Pikulik, is a citizen of the United States residing at 41604 N. Regal Road, Elk, Washington, 99009. Mr. Pikulik is the sole member of Spectrum U.S.

3.     Defendant, Ukraine, is a "foreign state" within the meaning of 28 U.S.C. § 1603(a).

4.     Defendant, the National Bank of Ukraine, is a separate legal person wholly owned by Ukraine and is responsible for regulating and supervising commercial banking within Ukraine.

As such, it is an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603(b).

5.      Defendant, the Deposit Guarantee Fund ("DGF"), is an independent State institution responsible for protecting depositors in the event of a bank liquidation.  The DGF is an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603(b).

6.      Defendant, the Security Service of Ukraine ("SSU")[1], is Ukraine's main internal security agency.  The SSU was formed after Ukraine declared its independence in 1991 from the Ukrainian branch of the Soviet KGB.  The SSU is an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603(b).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1330(a) as Ukraine is not entitled to immunity under statute or international agreement.

8.      This Court has jurisdiction over the NBU, DGF and SSU pursuant to 28 U.S.C. § 1330(a), 28 U.S.C. § 1603(a) and 28 U.S.C. § 1603(b) as the NBU, DGF, and SSU are agencies or instrumentalities of a foreign state that are not entitled to immunity under statute or international agreement.

9.      In particular, Ukraine, the NBU, DGF, and SSU are not entitled to immunity pursuant to 28 U.S.C. § 1605(a)(2) because, as alleged herein, the actions giving rise to this complaint occurred outside the territory of the United States in connection with a commercial activity of the foreign state that caused a direct effect in the United States.

10.      The NBU, DGF, and SSU are also not entitled to immunity pursuant to 28 U.S.C. § 1605(a)(3) because, as alleged herein, the actions giving rise to this complaint constituted an

---

[1] The Security Service of Ukraine is also sometimes identified by the abbreviation "SBU."

expropriation of property present in the United States and which has a commercial nexus to the United States.

11.     Defendants are subject to service of process under 28 U.S.C. § 1608.

12.     Venue is proper in this Court pursuant to 28 U.S.C. 1391(b)(3) and 28 U.S.C. 1391(f)(4).

## GENERAL ALLEGATIONS

13.     In 1994, Ukraine and the United States entered into a bilateral investment treaty ("Treaty").  Among other things, that Treaty obligates Ukraine and its state-controlled entities to provide "fair and equitable treatment" and "full protection and security" to United States companies that invest in Ukraine.

14.     Notwithstanding these protections, Ukraine's government and its various agencies have an unfortunate history of being used by Ukrainian oligarchs to target economic rivals.

15.     Since Ukraine's war with Russia began, numerous companies have reported inappropriate "governmental pressure," including fraudulent determinations of ownership, arrests of owners and managers, and seizures of assets, all seemingly targeted at impacting the companies' business or forcing the sale of their assets.  In some instances, these actions are based on "secret" letters issued by the SSU that are never provided to the impacted entities.  Ukraine's conduct in this regard is more fully described in Exhibits 1 and 2 to this Complaint.

16.     The scale of this misuse of Government authority is massive.  Ukraine's Prosecutor General, in an internal audit conducted after taking office, determined that out of 23,000 criminal cases being brought against business enterprises over a third (7,500) were without factual merit.

17.     On information and belief, Spectrum U.S. is being targeted by economic rivals utilizing these same "governmental pressures."

DM1\20802892.1

**SPECTRUM U.S.'S INVESTMENT IN UKRAINE**

18.      In 1998 the government of Ukraine established the DGF to protect the rights of bank depositors in Ukraine. Since that time, the DGF's role has grown to include the liquidation and provisional administration of failed banks.

19.      The NBU is Ukraine's central bank and in part, conducts oversight of commercial banks and has responsibility for declaring banks insolvent leading to the transfer of assets and administration to the DGF.

20.      While the NBU and the DGF are separate agencies, they remain highly inter-related and the NBU holds two of the five seats on the DGF administrative board.

21.      Since 2014 over 90 Ukrainian banks have been liquidated by the Ukrainian government.

22.      The DGF took in the liquidated assets of these banks and assumed administrative management of the banks themselves, thereby assuming the role of a commercial actor and engaging in commercial activities. As of 2018 DGF estimated that it had €16.5 billion (approximately $19.5 billion using 2018 average exchange rates) in such assets under its management.  The primary asset class held by DGF was non-performing loans.

23.      In 2016, the NBU, DGF, Ministry of Economic Development and Trade, and Transparency International Ukraine jointly created ProZorro.Sale, a state-owned electronic trading platform used, in part for the sale of DGF held assets. It is believed that as of March 2026, ProZorro.Sale has generated approximately USD 3 billion in Revenue at a 47% value increase.

24.      In order to bid in the DGF auctions and acquire the auctioned assets, investors were required to register with ProZorro.Sale, to be a company incorporated in Ukraine and to hold a financial services license issued by the NBU. The NBU, DGF and Ukraine have further engaged

in commercial activity through the creation, management and profit associated with ProZorro.Sale.

25.    In 2019, United States citizen Mikhail Trubchik, a resident of California, established Spectrum U.S., organized under the laws of the state of Delaware. At the time of formation, Mr. Trubchik was the sole member and 100% owner of Spectrum U.S.

26.    In October 2019, Spectrum U.S. formed Spectrum Assets LLC ("Spectrum Ukraine") as a wholly owned Ukrainian subsidiary, through a substantial initial investment of charter capital.

27.    Spectrum U.S. formed Spectrum Ukraine for the primary purpose of taking part in the DGF auctions and then holding and managing any assets so acquired.  In particular, Spectrum U.S.'s goal was to make targeted investments in commercial and sports real estate that were strategically aimed at enhancing local sports infrastructure, establishing a state-of-the-art athletics training facility, and generally expanding commercial development in the region.

28.    Spectrum Ukraine obtained a Financial Services License from the NBU on January 27, 2020, and purchased assets from a DGF auction for the first time in April 2020.

29.    Spectrum Ukraine took part in this and subsequent auctions using funds borrowed from Spectrum U.S.  Loans from Spectrum U.S. to Spectrum Ukraine were publicly disclosed in quarterly financial reports that Spectrum Ukraine filed with the NBU, and therefore were known to the NBU, the DGF, the SSU, and Ukraine.

30.    Since April 2020, the SSU, NBU, DGF and Ukraine have wrongfully, and with improper motives targeted Spectrum U.S., its owners and managers as well as its subsidiary, Spectrum Ukraine.

DM1\20802892.1

## SPECTRUM'S COMPLIANCE WITH UKRAINIAN LAWS REGARDING OWNERSHIP

31.     On April 1, 2021, Mr. Trubchik transferred ownership of Spectrum U.S. to Marina Evseeva, a United States citizen. Mr. Trubchik remained the Manager of Spectrum U.S.

32.     In accordance with NBU Regulation, Spectrum Ukraine timely applied to the NBU for recognition of this change in ownership by application dated September 8, 2021.

33.     On October 22, 2021, the NBU issued a written decision approving Marina Evseeva's acquisition of a significant stake in Spectrum U.S. and, through it, Spectrum Ukraine.

34.     To maintain its Financial Services License, Ukrainian law requires that Spectrum Ukraine and its parent company Spectrum U.S. maintain an "impeccable business reputation".

35.     On December 24, 2021, the Board of the National Bank of Ukraine passed Resolution No. 153.  Among other things, Paragraph 220-1 of Resolution No. 153 obligated financial service providers to independently assess and report on the business reputation of their key participants.

36.     On March 3, 2022, the Cabinet of Ministers of Ukraine issued Resolution No. 187. As is relevant here, Resolution 187 prohibits the "the discharge, including in compulsory enforcement, of monetary and other obligations whose creditors (claimants) are… legal entities incorporated and registered under the laws of Ukraine, whose ultimate beneficial owner, member or participant (shareholder) …. is a citizen of the Russian Federation, unless residing in the territory of Ukraine on legal grounds."  The resolution further provides that a transaction executed in violation of the moratorium would be null and void.

37.     On August 12, 2022, the Board of the National Bank of Ukraine Amended Resolution No. 153 to require, among other things, that Financial Services Providers:

- 6 -

"shall submit to the National Bank of Ukraine by November 9, 2022 information regarding the holder of direct or indirect substantial participatory interest in the financial services provider having or not having citizenship / tax residence of a state that commits / committed acts of armed aggression against Ukraine… or permanent place of business / place of registration / place of permanent residence in the relevant country."

38.    Spectrum Ukraine formally sought such information from Spectrum U.S. and its ownership, and on November 7, 2022, provided the NBU with proof of Spectrum U.S.'s citizenship and the US citizenship of Spectrum U.S.'s member, Marina Evseeva, including Spectrum U.S.'s certificate of incorporation and operating agreement and Marina Evseeva's US Passport, social security number, and driver's license.

39.    On April 27, 2023, Spectrum Ukraine provided the NBU with questionnaires completed by Spectrum U.S. and Marina Evseeva in which Spectrum U.S. and Marina Evseeva once again confirmed Spectrum U.S. and Marina Evseeva's U.S. citizenship.

40.    On December 29, 2023, the Board of the NBU enacted Resolution No. 199. Among other things, Resolution 199 established that an individual would have a "unsatisfactory business reputation" if that person "has citizenship and/or tax residency and/or permanent residence in a state that commits/committed acts of armed aggression against Ukraine within the meaning provided in Article 1 of the Law of Ukraine "on the Defense of Ukraine". Resolution No. 199 further required that by July 1, 2024, finance companies like Spectrum Ukraine must "independently verify the compliance by owners of significant participatory interest with the requirements for business reputation specified to by the Law of Ukraine "On Financial Services and Financial Companies."

41.    Resolution No. 187 was and remains a facial violation of the most favored nations status granted US citizens via the Bilateral Investment Treaty between the United States and

DM1\20802892.1

Ukraine because it provides treatment to residents of Ukraine that is more favorable than that afforded to residents of the United States.

42.    On May 28, 2024, Spectrum Ukraine sent a letter to Spectrum U.S. requesting that Spectrum U.S. provide information and supporting documents to verify whether Spectrum U.S. was located in Russia and complete a Legal Entity Questionnaire to verify Spectrum U.S.'s impeccable business reputation.  A similar request was sent to Spectrum U.S.'s sole shareholder, Marina Evseeva.

43.    On June 15, 2024, Spectrum U.S. provided a letter to Spectrum Ukraine confirming that it was not located or registered in a "state carrying out armed aggression against Ukraine," attaching the Questionnaire that it was provided with, its certificate of incorporation, its operating agreement, and a Memorandum of Association.

44.    On June 15, 2024, Marina Evseeva separately sent a letter to Spectrum Ukraine declaring that she was not a citizen or permanent resident of Russia, attaching her US Passport, her Social Security Number, her California Driver's license, and the questionnaire provided by Spectrum Ukraine.

45.    On June 28, 2024, Spectrum Ukraine confirmed to the NBU that it had performed the verifications required by Resolution No. 199.  In a March 2, 2026 ruling, the Northern Commercial Court of Appeals in Ukraine held that Spectrum Ukraine had taken the appropriate measures to conduct these verifications under Ukrainian law, and that there was no evidence that Spectrum Ukraine had any reason to believe Marina Evseeva was a citizen of a state other than the United States.

DM1\20802892.1

## THE BANK CONTRACTS

46.     Spectrum Ukraine participated in DGF-administered auctions between April 2020 and February 2024, acquiring substantial assets and loan portfolios held by Nadra Bank, Fido Bank, Prominvestbank, MR Bank and Megabank valued in the many millions of dollars.

47.     The auctions were conducted by the DGF using the Prozorro. Sale internet platform.

48.     In each instance, Spectrum Ukraine executed formal agreements to complete the acquisition of those assets, as detailed in the attached Exhibit 3.

49.     Each of the contracts set forth in Exhibit 3 was entered into between Spectrum Ukraine and the liquidated bank, which was represented by the DGF through a power of attorney.

50.     Each of the above contracts entered into in 2024 also incorporated the requirements of Resolution 187. Specifically, each contract contained a clause requiring that:

> The New Lender represents and warrants that as of the date of the conclusion of the Agreement the New Lender is not a person related to an aggressor state within the meaning of Decree No. 187 dated 03.03.2022 of the Cabinet of Ministers of Ukraine (as amended), in particular, is not a citizen of the Russian Federation (except for those residing in Ukraine on legal grounds), a legal entity incorporated and registered under the laws of the Russian Federation, or a legal entity created and registered under the laws of Ukraine whose ultimate beneficial owner, member or participant (shareholder) with 10 percent or greater interest in the authorized capital is the Russian Federation, a citizen of the Russian Federation, except for those residing within the territory of Ukraine on legal grounds, or a legal entity incorporated and registered under the laws of the Russian Federation.

51.     Each of the above contracts further provided that:

> … if the Bank discovers violation by the New Lender as specified in [the clause quoted above] of the Agreement, the New Lender shall, notwithstanding other provisions of the Agreement, pay the Bank a fine of 100% of the price of the Agreement no later than ten business days from the date of receipt of the relevant request of the

Bank …. [and] the Agreement shall terminate early on the eleventh calendar day from the date of sending by the Bank to the New Lender's address specified in the Agreement of a request for the payment of the fine provided for in this subparagraph of the Agreement, and the New Lender shall, by the date of termination hereof, return to the Bank all that which was acquired hereunder.

52.    In total, the assets that Spectrum purchased in these auctions, including Loan portfolios and property investments, are worth in excess of $127,000,000.

53.    Spectrum U.S. has made significant investments in its Ukrainian subsidiary to facilitate the acquisition of these investments, including an initial capital contribution of $554,506.39 and outstanding loans in excess of $2,000,000.

## SPECTRUM UKRAINE'S LICENSE

54.    On December 18, 2024, Radio Liberty's Skhemy project (an investigative journalism project) published two articles online targeting Spectrum U.S., its owners, and managers. The articles alleged that then owner Marina Evseeva was a Russian citizen based on the fact she received a Russian passport in 2004 and had a Russian taxpayer number.

55.    The articles also repeated disproven allegations (as described below) by the SSU that Spectrum U.S.'s former owner, and current manager, Mikhael Trubchik was suspected to be a "representative of a 'deeply covert network of Russian special services' that was "involved in plans to launder money of the Russian special services in Ukraine through hotel businesses as well as sports and transportation businesses."

56.    Skhemy interviewed the NBU, the DGF, and the SSU in connection with these articles.

57.    In one of those articles, Skhemy stated that:

DM1\20802892.1

"The National Bank responded to Skhemy that they had not known until now about Yevseeva's[2] Russian citizenship, since in the documents that Spectrum Assets submitted to the regulator it was stated that the Owner of the company is a U.S. citizen not related to the aggressor state. The National Bank stated that they had contacted the Security Service of Ukraine for official information on whether Yevseeva had a Russian Federation passport, and if they receive confirmation of this, they will have grounds to revoke the license from Spectrum Assets.

58.    With regards to the DGF, Skhemy wrote:

Skhemy asked the Deposit Guarantee Fund whether they had checked the bidders for connections to the aggressor state. They replied that during the inspection they relied on data from the public register of legal entities, which states, that Marina Yevseeva is a citizen of the United States.

The Deposit Guarantee Fund stated that if it turns out that the asset buyer had concealed the connection with the Russian Federation, it would have to pay a fine of 100% of the price of the lot – in this case that is 124 million hryvnias—and return the auctioned assets.

59.    A number of websites picked up the story from Skhemy including Yahoo Finance and Censor.Net.

60.    These false and misleading articles have had significant negative impact on Spectrum U.S., its owners and managers, and its assets as a result of wartime sentiments.

61.    In response to the Skhemy article, in December 2024, the NBU initiated an investigation into the citizenship of Spectrum Ukraine and its members.

62.    Following the Skhemy allegations, on December 19, 2024, Spectrum Ukraine sent a letter directly to Marina Evseeva as Spectrum U.S.' sole member/owner asking her to confirm or deny the allegations in the article.  She responded directly to Spectrum Ukraine on December 30, 2024, denying the allegations set out in the Skhemy article and reiterating her prior declaration that she was a United States citizen.

---

[2] Marina Evseeva's name is sometimes translated from Ukrainian as Marina Yevseeva.

- 11 -

63. On information and belief, on December 23, 2024, the SSU issued a letter to the NBU alleging that Marina Evseeva was a Russian Citizen.

64. On information and belief, that letter was signed by Anatolii Loif—head of the SSU Main Department for Counterintelligence Protection of Critical Infrastructure and Countering the Financing of Terrorism—who was fired from his role in May 2025 after he was caught on camera meeting with Ukrainian organized crime boss Serhii Oliinyk.

65. On information and belief, the claims in this letter were based entirely on outdated and second-hand information, including the fact that Marine Evseeva had received a Russian passport in 2004, had used a Russian passport in 2018, and had been assigned an individual taxpayer code by the Russian Federation.

66. On January 23, 2025, the NBU informed Spectrum Ukraine that:

> administrative proceedings were initiated on 23.01.2025 in relation to SPECTRUM ASSETS LIMITED LIABILITY COMPANY [Spectrum Ukraine]… and the owners of significant participatory interest therein: Marina Yevseieva, SPECTRUM UA CREDIT LLC [Spectrum U.S.], on the basis of the identification of hallmarks of unsatisfactory business reputation for the said persons

67. On Thursday, January 30, 2025, Spectrum Ukraine responded to the NBU's notice. That response established that Spectrum Ukraine had fully complied with Regulation 153 and Regulation 199 by receiving the necessary verifications from Spectrum U.S. and Spectrum U.S.'s shareholder. Spectrum Ukraine maintained that there was no evidence that it had anything other than an impeccable business reputation given its compliance with Ukrainian law.

68. On Monday, February 3, 2025 (just 1 business day after receiving Spectrum Ukraine's response), the NBU Committee on Supervision and Regulation of Non-Banking Financial Services Markets issued decisions finding that Spectrum U.S. and its shareholder did not have an impeccable business reputation, and, therefore, that Spectrum Ukraine did not have an

- 12 -

DM1\20802892.1

impeccable business reputation.

69.     The NBU did not communicate with Spectrum U.S. prior to making this finding regarding Spectrum U.S.' business reputation and did not identify any reliable evidence on which it made its determination.

70.     The NBU subsequently advertised these actions through a public press release on its website announcing that it had revoked Spectrum Ukraine's license and that it "continues to identify the hidden connections of the owners of financial companies with the Russian Federation and respond accordingly to the discovery of such facts."  This statement further (and falsely) suggested that Spectrum U.S. was owned by the Russian Federation or a citizen of the Russian Federation, exposing Spectrum U.S. to further adverse sentiment.

71.     On February 4, 2025, Spectrum Ukraine asked the NBU Committee on Supervision and Regulation of Non-Banking Financial Services Markets to provide it with six months in which to remedy the alleged breach.

72.     On February 6, 2025, the NBU replied to that request with an order clearly representing that the alleged infractions could be cured and directing Spectrum Ukraine to provide information regarding how it would do so, including:

a.  "measures taken by [Spectrum Ukraine] to eliminate the circumstances that may indicate the existence of the fact of the violation…providing documents/copies of documents and/or information confirming the measures taken;

b.  "Measures taken by [Spectrum Ukraine] to eliminate circumstances that may indicate the existence of the fact of the violation…with the provision of documents/copies of documents and/or information confirming the measures taken/to be taken and the timelines for their implementation."

73.     In reliance on these representations, on February 17, 2025, United States citizen Geno D. Pikulik entered into an Assignment of Membership Interest Agreement and a Share Acceptance and Transfer Agreement, through which Mr. Pikiluk became the sole legal and

- 13 -

DM1\20802892.1

beneficial owner of Spectrum U.S., and through it ownership and control of Spectrum Ukraine.

74.     The Assignment of Membership Interest provided that it "shall be governed by and construed in accordance with the laws of the State of California without regard to conflict of law principles."

75.     On February 20, 2025, Spectrum Ukraine informed the NBU that "on February 17, 2025 there was a sale of 100% participatory interest (shareholding) in [Spectrum U.S.] … the sole member of which is Marina Yevseieva, to the new owner, Yevhen Pikulik."  Spectrum Ukraine further provided the NBU with notarized copies of the Assignment of Membership Interest Agreement and Share Acceptance and Transfer Agreement, along with Ukrainian translations of both documents dated February 19, 2025.

76.     On February 24, 2025, the NBU confirmed this change in ownership, writing:

> Also, by letter Ref: 001-20/022025 dated February 20, 2025, [Spectrum Ukraine] reported that on February 19, 2025, the Company had received documents from Marina Yevseieva confirming the sale of 100% participatory interest (shareholding) in [Spectrum U.S.] to the new owner, Yevhen Pikulik (a copy of the transfer agreement for participatory interest in [Spectrum U.S.] and a copy of the transfer and acceptance certificate for participatory interest in [Spectrum U.S.] dated February 17, 2025, were attached to the letter).

77.     In the same letter however, the NBU argued that despite the transfer of shares to the new Owner, it considered Spectrum Ukraine's previous statements regarding Marina Evseeva's citizenship to be false representations.  The NBU upheld its prior decision that Spectrum U.S. and Spectrum Ukraine had a less than impeccable business reputation, thereby revoking Spectrum Ukraine's Financial Services License. NBU once again did not provide or otherwise identify any concrete evidence in support of its decisions or provide Spectrum U.S. with formal notice or opportunity to be heard.

- 14 -

DM1\20802892.1

78.    The NBU subsequently advertised these actions through a public press release on its website announcing that it had revoked Spectrum Ukraine's license and that it "continues to respond to the discovery of links owners of non-banking financial institutions have with the Russian Federation and to cleanse the market from such institutions."

79.    The NBU's decision finding that Spectrum U.S. and Spectrum Ukraine had a less than impeccable business reputation and revoking Spectrum Ukraine's Financial Services License was inconsistent with Article 50 of the Law of Ukraine "On Financial Services and Financial Companies," which provides that a Financial Services License may be revoked based on the owner of a significant share of the company's noncompliance with the requirements established by that Law "provided that such non-compliance cannot be remedied within six months from the date of its discovery."

80.    The fact that the NBU's process in reaching this decision without providing notice to Spectrum U.S., without providing either Spectrum U.S. or Spectrum Ukraine with opportunity for hearing and without identifying or providing any supporting evidence establishing that Spectrum U.S. or Spectrum Ukraine had violated Ukrainian law or regulations (and in particular Regulations 153 and 199) was arbitrary and capricious and in violation of international law. This is particularly so given the NBU's previous direction providing opportunity for Spectrum U.S. and Spectrum Ukraine to cure the alleged violations.

81.    The NBU's finding of a less than impeccable business reputation and the taking of Spectrum Ukraine's Financial Services License has left Spectrum Ukraine unable to pursue its business and, as described below, has resulted in the DGF's expropriation of Spectrum Ukraine's assets. It further leaves Spectrum Ukraine unable to manage or sell those assets it had previously

DM1\20802892.1

acquired, rendering Spectrum U.S. unable to recover the amounts already invested in Spectrum Ukraine.

## DGF'S TAKING OF SPECTRUM U.S.'S INVESTMENTS

82. Following the NBU's February 24, 2025, taking of Spectrum Ukraine's license, the DGF unilaterally declared that Spectrum Ukraine's acquisition and possession of the investments purchased in the February 7, 2024, auction was null and void.

83. The DGF—through the liquidated banks under its management—issued ten separate demands against Spectrum Ukraine asserting entitlement to the return of the assets purchased at auction and approximately $3 Million in penalties. In some cases, these demands were sent on February 13, 2025, the same day the NBU sent its demand to Spectrum Ukraine.

84. The timing of these demands demonstrate both collusion and coordination between the DGF and the NBU, and that neither felt any need to wait for Spectrum Ukraine's response to the NBU, which is consistent with the NBU's press release pre-emptively announcing that further action would be taken.

85. The DGF subsequently commenced a series of lawsuits in the Commercial Courts of Kyiv, Odessa, and Sumy, nominally brought in the name of the banks administered by the DGF. These actions seek title to the assets Spectrum Ukraine purchased in the 2024 auctions with no return of the purchase price, in addition to financial penalties equivalent to 100% of the purchase price paid by Spectrum Ukraine. All of these lawsuits were initiated after Geno Pikulik took ownership of Spectrum U.S.

86. The DGF, the NBU, and Ukraine have engaged in Commercial Activities by creating and managing the online auction platform, Prozorro.Sale and holding public auctions for the purchase of the assets—including land and financial loans—of banks under the management

and administration of the government of Ukraine, including but not limited to, Prominvestbank, MR Bank, NadraBank, Fido Bank, and Megabank.

87.     The DGF has further engaged in Commercial Activities through its governance and administration of the banks, including the supervision of their entry into contracts for the sale of the assets at issue in this case to Spectrum Ukraine.

88.     The DGF, NBU and Ukraine's actions, including the finding that Spectrum U.S. did not have an impeccable business reputation, the termination of Spectrum Ukraine's Financial Services License, the termination of the Contracts and the taking of Spectrum Ukraine's valuable assets have caused significant financial and reputational harm to Spectrum Ukraine and its sole owner, Spectrum U.S. These harms include, but are not limited to, the severe diminution of Spectrum Ukraine's assets, the almost total loss of Spectrum Ukraine's economic value as a going concern, the significant interference with legitimate, financial expectations, and substantial reputational harm. Spectrum Ukraine, and in turn, Spectrum U.S. have realized many of these losses through sales of property at substantially diminished value, disrupted loan agreements between Spectrum U.S. and Spectrum Ukraine, and the loss of a key business strategy and investment in the Ukraine.

## THE SECURITY SERVICE OF UKRAINE'S TARGETING OF SPECTRUM AND ATTEMPTED CONVERSION OF ITS ASSETS

89.     As part of the ongoing targeting of Spectrum U.S. and its members, in June 2020, the SSU engineered a fabricated case against Spectrum U.S.'s then owner and manager, Mr. Trubchik. Without any substantive evidence, the SSU declared Mr. Trubchik a representative of a "deeply secretive network of Russian special services that use cover documents of US citizens in their intelligence activities".

- 17 -

90.     As a result of these wrongful allegations, Mr. Trubchik was wrongfully placed on the National Security and Defense Council of Ukraine (NSDC) sanctions list. When he arrived in Ukraine in 2021, the SSU detained Mr. Trubchik at the airport and subsequently deported him to Turkey (a country he is not a resident or citizen of). While the allegations were ultimately disproven when the Kyiv District Administrative Court overturned the ban in 2021, the SSU continues its wrongful targeting of Spectrum U.S. and its members.

91.     On information and belief, the SSU has since made unsupported claims to the DGF, NBU, and others that Spectrum U.S.'s subsequent owner member, Marina Evseeva is a Russian citizen and that current owner member Geno Pikulik is not the rightful Owner of Spectrum U.S. and, through it, Spectrum Ukraine.

92.     On information and belief, the SSU has made these claims, including the claims set forth in the SSU's December 23, 2024, letter to the DGF, without any reliable supporting information, instead basing them on outdated and/or second-hand information.

93.     In a letter dated May 13, 2025, the SSU even acknowledged that it has no evidence that Marina Evseeva was a Russian citizen during any of the times relevant to the NBU or DGF's actions. Marina Evseeva was not a Russian Citizen during those time periods relevant to this suit.

94.     Despite this lack of evidence, on December 1, 2025, the SSU continued its attacks on Spectrum U.S. by filing a motion to intervene in one of the cases pending before the Commercial Court of Kyiv between Spectrum Ukraine and the DGF.

95.     In its motion, the SSU asked the Court to permit it to intervene in the action, and to name Spectrum U.S.'s sole owner, Geno Pikulik as a defendant to the action and requesting the Court: (1) declare Mr. Pikulik's 2/17/2025 purchase of Spectrum U.S. (which was executed between two U.S. citizens, concerning ownership of a U.S. company, under the laws of California)

DM1\20802892.1

invalid, (2) award as damages the purchase price that Geno Pikulik paid to purchase Spectrum U.S., and (3) award ownership of Spectrum U.S. to the SSU.

96.    The SSU's motion itself acknowledged that the disputed transaction was not executed in Ukraine but asserted that Ukraine had jurisdiction of necessity (forum necessitatis) because "there is no actual or legal possibility to bring the SSU's claims before the courts of another State (or, at the very least, it is extremely complicated)."

97.    The SSU further asserted that, despite the fact that the 2/17/2025 transaction was executed between two United States citizens, under the laws of the State of California, Ukrainian law would apply in interpreting the validity of that agreement because California law would conflict with the public policy of Ukraine or infringe upon the mandatory rules of Ukrainian law.

98.    At no time did the SSU serve Spectrum U.S. or Geno Pikulik in connection with its claims to seize ownership and control over Spectrum U.S.

99.    The DGF—through the bank under its administration—filed a brief joining in and supporting the SSU's request.

100.    The Commercial Court of Kyiv denied the SSU's motion to intervene on December 23, 2025.

101.    The SSU appealed that decision to the Northern Commercial Court of Appeals on December 31, 2025.

102.    On February 26, 2026, the appellate Court affirmed the lower court's ruling but recognized that "it should be noted that the Security Service of Ukraine may file an independent lawsuit."

- 19 -

DM1\20802892.1

103. The SSU has continued its wrongful efforts to seize control over Spectrum U.S. by filing a "Cassation Appeal" on March 6, 2026, asking the Cassation Economic Court (Ukraine's highest appellate court) to overturn the Northern Commercial Court of Appeals' ruling.

104. In its application to the Cassation Economic Court, the SSU articulated the following grounds for believing that Marina Evseeva is a Russian citizen:

a. The fact she received a Russian passport in 2004;

b. The fact she has a Russian taxpayer identification code;

c. The fact she has a Russian SNILS (social security equivalent) number;

d. The fact she used her Russian passport in 2018;

e. The fact that reporting by Skhemy claimed she traveled to Russia following the start of the war;

f. The identity of Spectrum Ukraine's landlord in Kyiv.

105. None of these factors legally establish or provide even a reasonable basis to infer that Marina Evseeva had not disclaimed her prior citizenship (as she stated in her answer to Spectrum Ukraine's inquiry) or that she was a Russian citizen during the relevant periods.

106. The SSU's actions are therefore arbitrary and capricious and in violation of international law.

107. On information and belief, if the SSU succeeds in expropriating ownership in Spectrum U.S., it will use its ill-gotten authority over Spectrum U.S. to liquidate Spectrum Ukraine and expropriate its assets.

## COUNT I

### (TORTIOUS INTERFERENCE WITH A PROPERTY RIGHT AGAINST NBU)

108. Plaintiffs incorporate all prior allegations as if set forth fully herein.

- 20 -

DM1\20802892.1

109. Spectrum U.S. owned valuable property rights through its ownership of Spectrum Ukraine. These include its ownership, management and control of Spectrum Ukraine as an ongoing business concern, the value of which was dependent on Spectrum Ukraine's Financial Services License.

110. Spectrum U.S., through its ownership of Spectrum Ukraine, had a property right in the financial assets owned by Spectrum Ukraine, including those loans that it made to Spectrum Ukraine for purposes of investing in the financial assets as well as in its rights of management and control over Spectrum Ukraine.

111. Spectrum U.S., independent of its ownership of Spectrum Ukraine, has a property right in those loans that it made to Spectrum Ukraine.

112. The NBU had knowledge of Spectrum U.S.' ownership of Spectrum Ukraine and the property rights at issue.

113. The NBU, aware of Spectrum U.S.' ownership of Spectrum Ukraine and its assets and the loans that Spectrum U.S. had provided to Spectrum Ukraine for the purpose of purchasing those assets, intentionally interfered with Spectrum U.S.' ownership rights without legal justification by:

   a. making a finding that Spectrum U.S. did not have an impeccable business reputation,

   b. terminating Spectrum Ukraine's Financial Services License on that basis, and

   c. causing DGF to terminate Spectrum Ukraine's contracts for financial assets and to impose financial penalties on that basis.

114. The NBU specifically determined the "business reputation" of Spectrum U.S., a U.S. Company, as well as its owners. In so doing, the NBU has deprived Spectrum U.S. of its property rights, including corporate goodwill, and its investments in and right to manage and

- 21 -

DM1\20802892.1

control Spectrum Ukraine as well as its rights to recover those assets.

115.    The NBU's actions were taken in connection with Ukraine's commercial activities, including the sale of assets, including land and loan portfolios, to private investors at auction.

116.    The NBU's actions, and determination of Spectrum U.S.' business reputation, caused harm to Spectrum U.S.

117.    The NBU's actions in this regard were wrongful.  They violated the Bilateral Investment Treaty between Ukraine and the United States by failing to provide the better of national treatment or most-favored-nation treatment to Spectrum U.S. and by discriminatorily expropriating valuable property without due process of law and without payment of compensation. They also occurred without the opportunity for a hearing and were arbitrary and capricious.

118.    The NBU's actions are also contrary to Ukrainian law, because the NBU failed to provide Spectrum U.S. with an opportunity to cure any defects in its ownership structure as it was required to do under Article 50 of the Ukrainian Law on Financial Services and Financial Companies.

119.    As a result of the NBU's actions, Spectrum U.S. has suffered damage to its property interests in excess of $127,000,000.  These losses were felt in the United States.

### COUNT II

### (TORTIOUS INTERFERENCE WITH A CONTRACT AGAINST NBU)

120.    Plaintiffs incorporate all prior allegations as if set forth fully herein.

121.    Spectrum Ukraine entered into the Contracts, each of which was legally valid.

122.    Spectrum U.S. was the controlling owner of Spectrum Ukraine and caused Spectrum Ukraine to enter into these contracts.  Spectrum U.S. was an intended beneficiary and

- 22 -

the ultimate beneficiary of the Contracts and had loaned Spectrum Ukraine much of the money necessary to enter into the Contracts.

123.    Spectrum U.S. therefore was an unnamed third-party beneficiary to the Contracts.

124.    The NBU had knowledge of these Contracts prior to December 2024.

125.    The NBU had knowledge of the relationship between Spectrum U.S. and Spectrum Ukraine and the specific fact that Spectrum U.S. had lent Spectrum Ukraine the funds to enter into the Contracts and was thereby a third-party beneficiary to them prior to December 2024.

126.    Following the Skhemy article, the NBU took intentional actions designed to interfere with Spectrum U.S.' business reputation and Spectrum Ukraine's Financial Services License.

127.    The NBU further took intentional actions to induce or cause the DGF to terminate or otherwise disrupt the Contracts and contractual relationship between the Banks and Spectrum Ukraine.

128.    The NBU's actions were taken in connection with Ukraine's commercial activities, including the sale of assets, including land and loan portfolios, to private investors at auction.

129.    The NBU's actions in this regard were wrongful.  They violated the Bilateral Investment Treaty between Ukraine and the United States by failing to provide the better of national treatment or most-favored-nation treatment to Spectrum U.S. and by discriminatorily expropriating valuable property without due process of law and without payment of compensation. They also occurred without the opportunity for a hearing and were arbitrary and capricious.

130.    The NBU's actions are also contrary to Ukrainian law, because the NBU failed to provide Spectrum U.S. with an opportunity to cure any defects in its ownership structure as it was required to do under Article 50 of the Ukrainian Law on Financial Services and Financial

DM1\20802892.1

Companies.

131.    As a result of the NBU's actions, the contractual relationships between the Banks and Spectrum Ukraine was wrongfully disrupted or breached.

132.    As a result of the NBU's actions, Spectrum U.S. has suffered damage to its property interests in excess of $127,000,000.  These losses were felt in the United States.

## COUNT III

### (INTENTIONAL INTERFERENCE WITH POTENTIAL ECONOMIC ADVANTAGE AGAINST NBU)

133.    Plaintiffs incorporate all prior allegations as if set forth fully herein.

134.    Spectrum U.S. incorporated Spectrum Ukraine for the purpose of acting as a financial services provider in Ukraine and purchasing distressed assets from the DGF-conducted auctions.

135.    The DGF continues to conduct such auctions, and Spectrum U.S. would have continued to invest in them through Spectrum Ukraine.  These ongoing auctions thus had a probability of future economic benefit to Spectrum U.S.

136.    The NBU had knowledge of the relationship between Spectrum U.S. and Spectrum Ukraine and the fact that Spectrum U.S. had previously helped to fund Spectrum Ukraine's participation in the DGF auctions.

137.    Spectrum U.S. would, through Spectrum Ukraine, have continued to invest in said auctions.

138.    Following the Skhemy article, the NBU took intentional actions designed to interfere with Spectrum U.S.'s business reputation and Spectrum Ukraine's Financial Services License.  The NBU did so with knowledge that these actions would prevent Spectrum U.S. and Spectrum Ukraine from participating in future DGF auctions.

- 24 -

139.    The NBU's actions in this regard were wrongful.  They violated the Bilateral Investment Treaty between Ukraine and the United States by failing to provide the better of national treatment or most-favored-nation treatment to Spectrum U.S. and by discriminatorily expropriating valuable property without due process of law and without payment of compensation. They also occurred without the opportunity for a hearing and were arbitrary and capricious.  The NBU's actions are also contrary to Ukrainian law, because the NBU failed to provide Spectrum U.S. with an opportunity to cure any defects in its ownership structure as it was required to do under Article 50 of the Ukrainian Law on Financial Services and Financial Companies.

140.    As a result of the NBU's actions, Spectrum U.S. has been deprived of the benefits of its prospective economic advantages.

141.    As a result of the NBU's actions, Spectrum U.S. has suffered lost investment opportunities of at least $127,000,000.  These losses were felt in the United States.

## COUNT IV

## (TORTIOUS INTERFERENCE WITH A CONTRACT AGAINST DGF)

142.    Plaintiffs incorporate all prior allegations as if set forth fully herein.

143.    Spectrum Ukraine entered into legally valid contracts with the Banks.

144.    Spectrum U.S. was an intended beneficiary and the ultimate beneficiary of the contracts between Spectrum Ukraine and these banks and had loaned Spectrum Ukraine the money necessary to enter into the contracts and therefore was an unnamed third-party beneficiary to them.

145.    The DGF had knowledge of those contracts prior to December 2024.

146.    The DGF had knowledge that Spectrum U.S. had funded those contracts and was thereby a third-party beneficiary to them prior to December 2024.

- 25 -

DM1\20802892.1

147. Following the Skhemy article, the DGF took intentional actions to induce or cause the wrongful termination those contracts or to disrupt the contractual relationship between the Banks and Spectrum Ukraine.

148. The DGF's actions were wrongful. They not only caused the wrongful termination of valid contracts, but they violated the Bilateral Investment Treaty between Ukraine and the United States by failing to provide the better of national treatment or most-favored-nation treatment to Spectrum U.S. and by discriminatorily expropriating valuable property without due process of law and without payment of compensation. They also occurred without the opportunity for a hearing and were arbitrary and capricious.

149. As a result of the DGF's actions, the contractual relationships between the Banks and Spectrum Ukraine was disrupted or breached.

150. Spectrum Ukraine, and through it Spectrum U.S., sustained resulting damages of $127,000,000, as will be proven at trial. These losses were felt in the United States.

## COUNT V

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST DGF)

151. Plaintiffs incorporate all prior allegations as if set forth fully herein.

152. Spectrum U.S. incorporated Spectrum Ukraine for the purpose of acting as a financial services provider in Ukraine and purchasing distressed assets from the DGF-conducted auctions.

153. The DGF continues to conduct such auctions, and Spectrum U.S. would have continued to invest in them through Spectrum Ukraine. These ongoing auctions thus had a probability of future economic benefit to Spectrum U.S.

DM1\20802892.1

154. The DGF had knowledge of the relationship between Spectrum U.S. and Spectrum Ukraine and the fact that Spectrum U.S. had previously helped to fund Spectrum Ukraine's participation in the DGF auctions.

155. Spectrum U.S. would, through Spectrum Ukraine, have continued to invest in said auctions.

156. Following the Skhemy article, the DGF took intentional actions to prevent Spectrum Ukraine, and through it Spectrum U.S., from participating in any future DGF auctions.

157. The DGF's actions were wrongful. They not only caused the wrongful termination of valid contracts and interfered with valuable economic expectations, but they violated the Bilateral Investment Treaty between Ukraine and the United States by failing to provide the better of national treatment or most-favored-nation treatment to Spectrum U.S. and by including the discriminatory expropriation of valuable property without due process of law and without payment of compensation. They also occurred without the opportunity for a hearing and were arbitrary and capricious.

158. As a result of the DGF's conduct, Spectrum U.S. and Spectrum Ukraine have been unable to participate in any future DGF auctions.

159. As a result of the DGF's actions, Spectrum U.S. has suffered lost investment opportunities. These losses were felt in the United States.

## COUNT VI

## (CONVERSION AGAINST DGF)

160. Plaintiffs incorporate all prior allegations as if set forth fully herein.

161. Spectrum U.S., through its wholly owned subsidiary Spectrum Ukraine, owned or had a right to possess the assets purchased through the Contracts.

- 27 -

DM1\20802892.1

162. The DGF, knowing of that right, has intentionally sought to exercise control over that property by compelling the banks to initiate proceedings to rescind the contracts.

163. The DGF has also directly asserted its present ownership or control of that property, preventing Spectrum Ukraine from utilizing the assets for commercial purposes and rendering them unsellable.

164. The DGF has further directed the banks to impose contractual fines against Spectrum Ukraine equivalent to the purchase price of the assets.

165. Spectrum Ukraine, and through it Spectrum U.S., sustained resulting damages of $127,000,000, as will be proven at trial.

## COUNT VII

## (UNJUST ENRICHMENT AGAINST DGF)

166. Plaintiffs incorporate all prior allegations as if set forth fully herein.

167. Spectrum U.S., through its wholly owned subsidiary Spectrum Ukraine, owned or had a right to possess assets purchased in the auctions.

168. The DGF, knowing of that right, intentionally sought to exercise control over that property by compelling the banks to initiate proceedings to rescind the contracts.

169. The DGF has further refused to permit the banks to return the funds utilized in the purchase of the assets.

170. The DGF has thereby received a benefit through the appropriation of the value of Spectrum U.S.'s investment in the assets.

171. That benefit has been received at Spectrum U.S.' expense, as Spectrum U.S. has been deprived of the value of the funds that Spectrum Ukraine spent to purchase the assets.

- 28 -

DM1\20802892.1

## COUNT VIII

### (DECLARATORY JUDGMENT BY SPECTRUM US AND GENO PIKULIK AGAINST SSU)

172.    Plaintiffs incorporate all prior allegations as if set forth fully herein.

173.    The Assignment of Membership Interests is a valid and legally binding Contract executed under California law, between two United States citizens, and concerning the ownership of a Delaware LLC.

174.    The SSU and Ukrainian government have no valid legal basis to challenge the existence or legally binding effect of the Assignment of Membership Interests under United States law.

175.    The SSU and the Ukrainian government have no valid legal basis to purport to seize a United States' citizen's shares in a domestic LLC.

176.    The SSU and Ukraine's actions constitute an attempt to expropriate Geno Pikulik's property and concern a commercial activity (ownership of a domestic LLC) occurring in the United States.

177.    Spectrum U.S. requires clarity as to whether its legal owner is Geno Pikulik, or whether the Assignment of Membership Interests is invalid and it is still owned by Marina Evseeva.

## COUNT IX

### (TRESPASS AGAINST CHATTELS BY GENO PIKULIK AND SPECTRUM US AGAINST THE SSU)

178.    Plaintiffs incorporate all prior allegations as if set forth fully herein.

179.    Gino Pikulik is the rightful owner and sole member of Spectrum U.S. under American law.

- 29 -

DM1\20802892.1

180.   The SSU has asserted its and Ukraine's legal ownership of Spectrum U.S.

181.   On information and belief, the SSU has knowingly and intentionally taken this action in order to gain control over Spectrum Ukraine, eliminating the need for the Ukrainian government to pursue individual assets through the litigations initiated by the DGF.

182.   Through these actions, the SSU has interfered with Geno Pikulik's ownership of Spectrum U.S., and with Spectrum U.S.'s ownership and controlling interest in Spectrum Ukraine.

183.   These actions have been taken without consent.

184.   These actions are not justified by factual support and are therefore arbitrary and capricious and in violation of International law.

185.   The SSU and Ukraine's actions constitute an attempt to expropriate Geno Pikulik's property and concern a commercial activity (ownership of a domestic LLC) occurring in the United States.

186.   As a result of these actions, the value of Geno Pikulik's ownership of Spectrum U.S. has been diminished.

187.   As a result of these actions, the value of Spectrum U.S.'s ownership of Spectrum Ukraine has been diminished.

188.   Spectrum Ukraine, and through it Spectrum U.S. and Geno Pikulik, sustained resulting damages of $127,000,000, as will be proven at trial. These losses have been felt in the United States.

## COUNT X

## (CIVIL CONSPIRACY AGAINST SSU, NBU AND DGF)

189.   Plaintiffs incorporate all prior allegations as if set forth fully herein.

- 30 -

DM1\20802892.1

190.    Following the publication of the Skhemy article, the DGF, SSU, and the NBU, acting together, agreed to a common plan or design to commit one or more tortious acts with the purpose of invalidating Spectrum U.S.' investments in Ukraine.

191.    The NBU, SSU, and the DGF, together or separately, engaged in wrongful acts including but not limited to determining, based on irrelevant information, that Marina Evseeva was a Russian citizen, determining that Spectrum U.S.' business reputation was not impeccable, revoking Spectrum Ukraine's Financial Services License, inducing the Banks with which Spectrum Ukraine had contracted on Spectrum U.S.' behalf to repudiate their contracts with Spectrum Ukraine, interfering in Spectrum Ukraine's property interests under the Contracts, and wrongfully claiming ownership of Spectrum U.S.

192.    As part of this conspiracy, the DGF has engaged in commercial activities in Ukraine, including entering into contracts with Spectrum Ukraine.

193.    As part of this conspiracy, the SSU and Ukraine have engaged in commercial activities in the United States, including asserting ownership of a U.S. LLC.

194.    Spectrum Ukraine, and through it Spectrum U.S., sustained resulting damages of $127,000,000, as will be proven at trial. These losses have been felt in the United States.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

a.  Awarding Plaintiffs their actual damages against Defendants, jointly and severally;

b.  Awarding Plaintiffs consequential damages to the extent permitted by law;

c.  Declaring that the Assignment of Membership Interests is valid under California law and that Geno Pikulik is the sole owner of Spectrum UA Credit LLC pursuant to that contract;

- 31 -

DM1\20802892.1

d. Declaring that the SSU and Ukraine have no legal claim to ownership of Spectrum UA Credit LLC;

e. Awarding Plaintiffs pre-judgment interest; and

f. Granting such other and further relief as the Court deems just and proper.

Dated: March 31, 2026

/s/ Brian H. Pandya

Brian H. Pandya (DC Bar No. 501661)
DUANE MORRIS LLP
901 New York Avenue NW
Suite 700 East
Washington, DC 20001-4795
Telephone:    +1 202 776 7800
Facsimile:    +1 202 776 7801

Owen K. Newman (pro hac vice pending)
Chris J. Chasin (pro hac vice pending)
DUANE MORRIS LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603-3433
Telephone:    +1 312 499 6700
Facsimile:    +1 312 499 6701

Attorneys for Spectrum UA Credit LLC and
Geno Pikulik

- 32 -

DM1\20802892.1

## VERIFICATION

I, Geno Pikulik, verify under penalty of perjury that the foregoing is true and correct.

Executed on: 3/25/26

Signed by:

BE0ADA71431A4EF...

Plaintiff
In his individual capacity and on behalf of Spectrum
UA Credit LLC.

DM1\20802892.1